[Cite as *In re A.N.*, 2021-Ohio-4214.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE A.N. | : | |
| | : | No. 110608 |
| Minor Child | : | |
| | : | |
| [Appeal by Father] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 2, 2021

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-20902756

### *Appearances:*

Scott J. Friedman, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Appellant-Father ("Father") appeals from the juvenile court's decision awarding permanent custody of his minor child, A.N., to the appellee Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we affirm.

## I. Procedural Background

{¶ 2} CCDCFS became involved with the family when A.N., then 12 years old, was left home alone after Father was hospitalized. On March 3, 2020, the agency filed a complaint alleging that A.N. was abused, neglected, and dependent, and requesting a disposition of temporary custody. The complaint alleged that Father lacked appropriate parenting skills and judgment to provide proper care for A.N.[1] The juvenile court granted the agency's motion for predispositional custody the same day.

{¶ 3} On June 1, 2020, the court conducted a hearing on the agency's complaint. The father denied the allegations and the matter was continued for trial. On June 3, 2020, the agency developed a case plan that included services addressing Father's mental health needs and substance abuse concerns. His case plan also focused on appropriate parenting, which included setting clear boundaries on age-appropriate interactions and conversations. The goal of the case plan was reunification. Father disagreed with the established case plan, contending that he did not need assistance with his parenting of A.N.

{¶ 4} On September 24, 2020, Father stipulated to an amended complaint alleging A.N. dependent and agreed to temporary custody. On October 15, 2020, the juvenile court adjudicated A.N. dependent and granted the agency temporary custody. The court approved the agency's case plan for Father, and A.N.'s case plan was amended to include mental health services. Reunification remained the goal.

---

[1] A.N.'s mother is deceased.

{¶ 5} In January 2021, CCDCFS moved to extend temporary custody, contending that Father was progressing on his case plan. However, on February 12, 2021, the agency filed a motion to modify temporary custody to permanent custody because of Father's failure to follow through with case plan services and show any benefit from the services already completed. At a review hearing on February 22, 2021, the agency orally withdrew its motion for an extension of temporary custody, advising the court that it would move forward on its motion for permanent custody.

{¶ 6} On March 18, 2021, the agency filed a notice of emergency amendment to Father's case plan, advising that it was suspending Father's visitation and communication with A.N. because of concerns regarding A.N.'s mental health when the visitations occurred. The juvenile court conducted a hearing where Jamessa Motley ("Motley"), the agency case worker assigned to the case, testified that A.N. suffers from anxiety when visiting with Father. She stated that Father's conversations were inappropriate and negative. Specifically, she stated that Father discussed his case plan and legal proceedings with A.N., criticized A.N.'s appearance by asserting that he was wearing "gay" or "gang" colors, and made A.N. uncomfortable with derogatory remarks about his foster mother and her sexuality.

{¶ 7} At the hearing, Father admitted that he did not want his child wearing "gay colors," or participating, wearing, or representing "that type of activity." Father stated that during the visits he would educate his son about God, the Bible, anthropology, and the process of maturity. He stated that he understood why his

son was "stressed" during his visits because he was teaching his son things contrary to what his foster mother was telling A.N.

**{¶ 8}** Over objection, the juvenile court adopted the emergency amendment to the case plan and suspended Father's visitation. Trial on the agency's motion for permanent custody remained set for May 26, 2021.

**{¶ 9}** The day before trial, Father requested a continuance for the purpose of ordering a polygraph test for himself and Motley. Prior to the start of trial, the court denied Father's request.

## II. Permanent Custody Hearing

**{¶ 10}** Katie Russell ("Russell") testified that she is A.N.'s therapist at Ohio Mentor. She stated that she began working with A.N. on March 17, 2020. According to Russell, A.N. was diagnosed with post-traumatic stress disorder ("PTSD") and attention deficit hyperactivity disorder ("ADHD"). She stated that A.N. suffered from psychosomatic symptoms such as difficulty breathing, muscle spasms, and headaches when extremely stressed. Russell stated that these symptoms were triggered by stress from Father and school. She stated that Father criticized A.N. and did not appreciate A.N.'s mental health needs. Russell testified that A.N. was not comfortable communicating with Father because to do so was showing "weakness." She stated that A.N. struggled to stay focused on himself because he worried about his father's health and his inability to take care of his father. She stated that A.N. assumed the role of caregiver when "he just wanted to a be a kid."

{¶ 11} Russell testified that A.N. commented that he preferred to stay in foster care. She stated that A.N. is happy with his foster family, and that his foster mother actively engages in the therapeutic process and facilitates A.N.'s usage of his coping skills when symptoms occur. According to Russell, A.N. wished for permanent custody to the agency.

{¶ 12} Motley testified that she was assigned to the case in March 2020, and developed a case plan for Father that included mental health services, substance abuse treatment and counseling, and parenting.

{¶ 13} Regarding the mental health component, Father had been involved with Circle Health in 2018, but was only being treated with pharmacological care — not therapeutic care. Father self-reported that he suffers from depression and anxiety; however, the agency learned that Father was not forthcoming because medical records revealed that he was diagnosed with both schizophrenia and schizoaffective disorder, which both have effects of auditory and visual hallucinations. Additionally, the records noted that Father's medication compliance was sporadic. Following an assessment with the court's diagnostic clinic, the Father's case plan included cognitive behavioral therapy, pharmacological services for medications, and in-home services to assist with visitation.

{¶ 14} Motley testified that Father often exhibited paranoia behaviors — asserting that the agency was "out to get him," blaming the agency, or complaining that he was being targeted during visitations. She stated that when Father

participated in remote staffing reviews, he became very volatile and argumentative and had to be muted by the facilitator.

{¶ 15} Motley stated that Father did not initially engage in therapeutic services, which was concerning because if he was noncompliant with his medications, his mental health status was not being monitored. Motley admitted that Father engaged in therapeutic services two months prior to trial, and that Father's diagnosis does not prevent reunification.

{¶ 16} Regarding the substance abuse component of his case plan, Father completed an intensive outpatient program ("IOP") with Catholic Charities, including attending AA meetings. She stated that Father completed all requested drug screens until July and August 2021, when he purportedly could not obtain transportation to the screens. When she stated that she provided Father with bus passes, Father abruptly interrupted the proceedings, shouting that Motley was "lying," reiterating his reason for seeking polygraph tests.

{¶ 17} Despite Father's lapse in submitting to drug screens, the agency determined that Father had completed the substance abuse component of his case plan based on his completion of the IOP program and the negative screens. Motley testified that she could not state that he benefitted from the services given, however, because he did not submit to any drug screens after March 2021.

{¶ 18} Regarding the parenting component of Father's case plan, Motley testified that Father had not fully completed this component nor benefitted. Father was referred to Beech Brook's Nurturing Parenting Programs and assigned a

supportive visitation coach through Catholic Charities. Father completed the one-on-one program but did not fully complete the group program. It was the agency's position that Father did not complete the parenting component of the program because he had not benefitted from the parenting component. Motley stated that Father would engage in behavior during visits with A.N. that were detrimental to A.N. and A.N.'s mental health. Motley testified that during those visits, Father's conversations would turn negative, blaming the agency for his situation, criticizing A.N., and making derogatory remarks about A.N.'s foster mother.

{¶ 19} Motley also testified there was initial concern that Father was instructing A.N. how to download pornography onto a cell phone that Father provided to A.N. According to Motley, these issues and the severe stress A.N. suffered were the reasons why the court suspended Father's visitation and communication.

{¶ 20} Motley opined that it was in A.N.'s best interest that permanent custody be granted because of concerns whether A.N.'s mental health treatment would continue if he remained in Father's care.

{¶ 21} Father, who appeared an hour late to the hearing due to reported transportation issues, testified that he disagreed with the testimony of Motley, which was why he sought polygraph tests. He did not dispute the testimony regarding the conversations that he engaged in with A.N. but maintained that his parenting style was appropriate. He stressed that his job was to be a parent, not a friend, which is why he needed to educate his son. When asked whether a relative was available to

care for his son, Father stated that he did not trust anyone, but if he could, he would "scrutinize them enough to see if they would actually fit the criteria, you know, fit completely." (Tr. 119.)

{¶ 22} A.N.'s guardian ad litem, Gail Nanowsky, provided her recommendation in favor of permanent custody, which supplemented her written recommendation. She stated that A.N., who was almost 14 years old at the time of trial, "wishe[d] to remain in his foster home. He would like to be adopted by foster mother." Nanowsky further stated that she did not believe that A.N. could be reunified with Father within the next year, and that given the mental health issues of both Father and child, "it would not be in [A.N.'s] best interest to be reunified with [Father]."

{¶ 23} Child's foster mother testified A.N. "without a doubt" loves his father. She explained to the court the dynamic of her home and said that A.N.'s disposition had changed dramatically from his initial placement to now. She stated that with his mental health issues under control, A.N. was thriving in school and maintaining friendships.

{¶ 24} The juvenile court granted CCDCFS's motion for permanent custody.

## III. The Appeal

{¶ 25} Father now appeals, raising as his sole assignment of error that the juvenile court erred in terminating his parental rights, in violation of his rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution. Specifically, Father contends that the juvenile court's

decision terminating his parental rights was against the manifest weight of the evidence.

{¶ 26} In the context of the termination of parental rights, the due process rights provided by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution, ensure that the termination proceeding is fundamentally fair. *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 17, citing *Santosky v. Kramer*, 455 U.S. 745, 753-754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (1991). Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' *Id.*" *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997).

{¶ 27} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *Hayes* at 48; *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky* at 753. However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979); *see also In re T.H.*, 8th Dist. Cuyahoga No. 107947, 2019-Ohio-3045, ¶ 15, citing *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694,

2015-Ohio-1028, ¶ 7 (termination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child).

{¶ 28} "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create a more stable life for a dependent child and to "facilitate adoption to foster permanency for children." *N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

{¶ 29} Pursuant to R.C. 2151.414, a trial court may grant permanent custody of a child to an agency if, after a hearing, the court determines by clear and convincing evidence that one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies, and that an award of permanent custody is in the child's best interest. The Ohio Supreme Court defines clear and convincing evidence as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. This court will not reverse a juvenile court's award of permanent custody as being against the

manifest weight of the evidence when the record contains competent, credible evidence by which the court could have found that the essential statutory elements for any award of permanent custody have been established. *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 22.

### A. R.C. 2151.414(B) Factors

{¶ 30} The R.C. 2151.414(B)(1)(a) through (e) factors are: (a) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; (b) the child is abandoned; (c) the child is orphaned and no relatives are able to take permanent custody of the child; (d) the child has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period; and (e) the child or another child of the parent or parents has been adjudicated an abused, neglected, or dependent child on three separate occasions.

{¶ 31} In this case, the juvenile court found that the condition set forth in R.C. 2151.414(B)(1)(a) applies — A.N. cannot be placed with either parent within a reasonable time or should not be placed with either parent. In making this determination, courts look to the factors set forth in R.C. 2151.414(E). If a court determines that one or more of the R.C. 2151.414(E) factors exist as to each of the parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E); *In re Ca.C.*, 8th Dist. Cuyahoga No. 107514, 2019-Ohio-546, ¶ 12.

{¶ 32} Here, the juvenile court found that several R.C. 2151.414(E) factors exist. Specifically, the court found that Father had failed to substantially remedy the conditions causing A.N. to be placed outside the home (R.C. 2151.414(E)(1)); Father has a chronic mental illness and chemical dependency that is so severe that it makes him unable to provide an adequate permanent home for A.N. at the present time, and as anticipated, within one year (R.C. 2151.414(E)(2)); Father has demonstrated a lack of commitment by failing to regularly support, visit, or communicate with A.N. when able to do so, or by other actions showing an unwillingness to provide an adequate, permanent home for A.N. (R.C. 2151.414(E)(4)); and "[F]ather was in agreement with adjudication and temporary custody in this matter. Father repeatedly has inappropriate conversations with the child that affect the child's mental health." (R.C. 2151.414(E)(16)).

{¶ 33} Father contends that the juvenile court's findings are unsupported by competent and credible evidence because he substantially remedied the conditions that caused the A.N.'s removal. According to Father, he completed most of his case plan objectives, which included mental health treatment, substance abuse counseling, and parenting classes. Additionally, he contends that he fully remedied the condition that caused A.N.'s removal because what caused A.N.'s removal was Father's decision to leave A.N. home alone during Father's hospitalization. But, this short-sighted belief fails to grasp the significance of A.N.'s needs. The evidence presented at trial admittedly demonstrates that Father can provide for the basic needs of A.N., but A.N.'s needs go well beyond just basic needs.

{¶ 34} Father contends that "his mental illness, by itself, cannot serve as a basis for determining that a termination of parental rights is in [A.N.'s] best interest." While we agree that mental illness alone is an insufficient basis, Father's mental health diagnoses were not the basis for the juvenile court's decision. Rather, the decision was based on Father's inability to consistently maintain treatment for his mental health needs. Motley testified that Father's prior treatment only consisted of pharmacological care, not therapeutic care. She stated that Father only recently engaged in therapeutic care, which was approximately a year after A.N. had been removed from his care. Additionally, she stated that Father's inability to consistently take his medications was concerning.

{¶ 35} Regarding the parenting component of Father's case plan, the testimony revealed that Father never fully completed or benefited from this component. Father was referred to Beech Brook's Nurturing Parenting Programs and assigned a supportive visitation coach. It was the agency's position that Father did not complete the parenting component of the program because Father had not benefitted from the parenting services. Motley stated that Father would engage in behavior during visits with A.N. that were detrimental to A.N. and A.N.'s mental health.

{¶ 36} The juvenile court found that Father "repeatedly has inappropriate conversations with the child that affect the child's mental health." Competent and credible evidence supports this finding. Russell, A.N.'s therapist, testified that during a telephone visit, she observed A.N. become so visibly upset and stressed that

he wanted to end the visit. Motley also testified that Father would discuss his case plan and the legal proceedings with A.N. Although Father was told to keep the visits focused on A.N. and stay to positive, the conversation would often turn to Father talking negatively about A.N.'s foster mother, and criticizing A.N. Additionally, there was initial concern that Father was instructing A.N. how to download pornography onto a cell phone that Father provided to A.N. These issues and the stress they triggered in A.N. caused the court to suspend Father's visitation and communication.

{¶ 37} Father contends that the juvenile court's finding that he has inappropriate conversations with A.N. that affect A.N.'s mental health is insufficient to support terminating his parental rights because "parents have a fundamental right to communicate their moral and religious values to their children." In support, he relies on *Pater v. Pater*, 63 Ohio St.3d 393, 588 N.E.2d 794 (1992). Although the Ohio Supreme Court stated that "a parent may not be denied custody of a child on the basis of the parent's religious practices," the court clarified, "unless there is probative evidence that those practices will adversely affect the mental or physical health of the child." *Id.* at paragraph one of the syllabus.

{¶ 38} In this case, the evidence demonstrates that Father's belief and practices have indeed adversely affected the mental and physical health of A.N. Russell and Motley both testified that A.N. suffers from psychosomatic symptoms caused, in part, by Father's criticisms and judgments, and nonsupport of A.N.'s mental health needs. The juvenile court heard testimony that A.N. "just wanted to

be a kid," and not the caregiver. The evidence demonstrated that Father treats A.N. not as a child but as an adult. This explains why Father considered it appropriate to leave his 12-year-old son home alone for an extended period of time while he was hospitalized. Accordingly, competent and credible evidence supports the juvenile court's determination that Father had not remedied the conditions that led to A.N.'s removal, and therefore that A.N. cannot be placed with Father within a reasonable time or should not be placed with either parent

## B. Best Interest Finding

{¶ 39} Having found that the juvenile court properly concluded that at least one of the R.C. 2151.414(B)(1) conditions applied, we must determine whether the juvenile court appropriately found that permanent custody to the agency was in A.N.'s best interest.

{¶ 40} When considering the best interest of a child, R.C. 2151.414(D)(1) directs the court to consider all relevant factors, including, but not limited to: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (c) the custodial history of the child; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7) through (11) apply. Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent custody determination,

"there is not one element that is given more weight than the others pursuant to the statute." *In re Schaefer*, 11 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶ 41} In this case, the juvenile court stated in its journal entry that it considered the R.C. 2151.414(D)(1) factors and found "that the child's continued residence in or return to the home of [Father] would be contrary to the child's best interest." We agree.

{¶ 42} Although testimony was presented that Father engaged in all the required case plan services and that he successfully completed some of those services, this court is mindful that permanent custody pertains to what is in the child's best interest. The natural rights of a parent are not absolute, and are subordinate to the child's best interest when determining the appropriate resolution in a permanent custody proceeding. *B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, at ¶ 20. Thus, the child's best interest is the "'polestar or controlling principle'" that is to be observed. *Id.*, quoting *Cunningham*, 59 Ohio St.2d at 106, 391 N.E.2d 1034.

> Thus the fundamental or primary inquiry at the dispositional phase of these juvenile proceedings is not whether the parents of a previously adjudicated "dependent" child are either fit or unfit. The mere fact that a natural parent is fit, though it is certainly one factor that may enter into judicial consideration, does not automatically entitle the natural parent to custody of his child since the best interests and welfare of that child are of paramount importance. * * * Parental interests must be subordinated to the child's interest in determining an appropriate disposition of any petition to terminate parental rights. (Citations omitted.)

*Id.*

Both the best-interest determination and the determination that the child cannot be placed with either parent focuses on the child, not the parent. *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994). In fact, the plain language of R.C. 2151.414(C) prohibits a court from considering the effect granting permanent custody to the agency would have upon Father.

{¶ 43} Regarding the interactions between the child and his Father and foster family, the court heard testimony that A.N. is happy in his foster placement and is thriving. Testimony from Russell and Motley revealed that A.N.'s primary stressors in life stemmed from Father's judgment and criticisms. They both testified that A.N. would be visibly stressed during visitations with Father, some of which were terminated early due to A.N.'s responses or Father's inappropriate conversations. Ultimately, visitation was suspended. Motley stated that A.N. needs a supportive environment, which she determined, based on her observations and conversations with A.N. and Father, would not exist with Father.

{¶ 44} Most importantly, the juvenile court conducted an in camera interview with A.N., who, at the time, was three months from turning age 14. During that interview, the child discussed with the court his relationship with Father and his foster family. The juvenile court obtained the child's wishes through this interview. Those wishes were consistent with what Nanowsky reported at the permanent custody hearing — that the child preferred that the court grant permanent custody. (Tr. 136.)

{¶ 45} As for custodial history, A.N. has been in the agency's custody since his removal in March 2020 and lived with the same foster family since that time.

{¶ 46} Regarding the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, the testimony reveals that Father can no doubt provide for A.N.'s basic needs, including food, shelter, and clothing. But the need for a legally secure permanent placement goes beyond mere tangible items; it requires an environment for nurturing and growth. "[A] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security." *M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, at ¶ 11, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). Clear and convincing evidence was presented to the juvenile court that the living environment with Father triggers undue hardship and stress onto A.N., which generates psychological and physical manifestations. Competent, credible evidence supports the juvenile court's finding that a permanent placement that fosters growth, stability, and security just cannot be achieved with Father.

{¶ 47} Father contends that the juvenile court did not discuss the R.C. 2151.414 factors prior to entering its written decision granting the agency permanent custody. This is true. However, the Ohio Supreme Court recently stated that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, Slip Opinion No. 2019-0923, 2020-Ohio-5102, ¶ 31.

Nevertheless, in agreement with the high court, "we likewise strongly encourage juvenile courts to [specifically address each factor]." *Id.* at ¶ 32. "Discussion of the statutory best-interest factors in R.C. 2151.414(D)(1) would similarly facilitate appellate review of permanent custody judgments." *Id.* Moreover, "including a discussion of best-interest factors in [the juvenile court's] decision granting permanent custody of a child to an agency is also likely to increase public confidence in the judicial process in this most important area of parental rights." *Id.*

{¶ 48} Father's assignment of error is overruled.

{¶ 49} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, PRESIDING JUDGE

LISA B. FORBES, J., and
EILEEN T. GALLAGHER, J., CONCUR