[Cite as *In re L.R.-R.*, 2022-Ohio-3744.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE L.R.-R., ET AL. | : | |
| | : | No. 111444 |
| Minor Children | : | |
| | : | |
| [Appeal by Mother, X.R.-R.] | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 20, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-20-901104 and AD-20-901105

---

***Appearances:***

Valore & Gordillo LLP and Matthew O. Williams, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

LISA B. FORBES, J.:

{¶ 1}   X.R.-R. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her children, L.R.-R. and Xi.R.-R. (collectively, the "Children") to the Cuyahoga County Division of Children

and Family Services ("CCDCFS"). After reviewing the facts of the case and pertinent law, we affirm.

## I. Facts and Procedural History

{¶ 2} On January 27, 2020, the Children were committed to the emergency temporary custody of CCDCFS pursuant to R.C. 2151.31, after "the [C]hildren were brought to Jane Edna Hunter after their mother failed to pick them up from school." At that time, L.R.-R. was eight years old and Xi.R.-R. was six years old. The following day, CCDCFS filed a complaint alleging that the Children were neglected and that L.R.-R. was abused. L.R.-R. had "multiple injuries to various parts of his body in different stages of healing * * * caused by [M]other using a hanger and her boyfriend using a belt to punish the child." On the same day, the juvenile court held a hearing and granted CCDCFS predispositional temporary custody. Mother could not be located.

{¶ 3} On September 17, 2020, Xi.R.-R. was adjudicated neglected and L.R.-R. was adjudicated abused and neglected. On the same day, CCDCFS was granted temporary custody of the Children.

{¶ 4} CCDCFS was granted two extensions of temporary custody. The first extension was granted on April 1, 2021, and the second extension was granted on July 13, 2021.

{¶ 5} The court held a hearing on CCDCFS's motion to modify temporary custody to permanent custody of the Children on March 16, 2022 ("the hearing"). The same day, the court journalized an entry for each of the Children terminating

Mother's parental rights and granting permanent custody of the Children to CCDCFS. It is from these orders that Mother appeals.

## II. March 16, 2022 Hearing

{¶ 6} The following testimony and evidence were presented at the March 16, 2022 hearing.

### A. Briana Buckhalter

{¶ 7} Briana Buckhalter ("Buckhalter") testified that she is an "[e]xtended social worker" for CCDCFS assigned to work on the Children's case in May 2020. Buckhalter was "off the case from * * * November 2021 till January 2022" when she left CCDCFS's employment briefly; she was reassigned to the Children's case when she returned. In the period from November 2021 to January 2022, Stacy Jackson ("Jackson") was assigned to the case. After Buckhalter's return, Buckhalter and Jackson both worked on the Children's case.

{¶ 8} According to Buckhalter, under the case plan established by CCDCFS, Mother was referred to parenting services and domestic violence services. Mother was referred to parenting services because she did not have "age-appropriate boundaries for the [C]hildren." When CCDCFS became involved with the Children, Mother "stated that she didn't know that [L.R.-R.] had the marks on him because she kind of let them do their own thing, like bathe themselves * * *." Buckhalter testified that Mother "didn't properly make sure [the Children] were safe." Mother was referred to domestic violence services because "[w]hen the case came to the Agency, there was physical abuse on one of the children."

{¶ 9} For both parenting and domestic violence services, Mother "was referred to * * * the Child Advocacy Center, and Latino Project." Buckhalter explained that "those were the only options at the time" because Mother "only speaks Spanish."

{¶ 10} Mother reported to Buckhalter that she was going to "do an online parenting that was in Puerto Rico[.]" However, Buckhalter never received anything indicating Mother completed that class.

{¶ 11} During the time Buckhalter was assigned to this case, Mother "made no progress" on either her parenting or domestic violence services. According to Buckhalter, parenting classes are typically 12-weeks long and domestic violence classes are four-weeks long.

{¶ 12} According to Buckhalter, Mother was "picked up for her charges" of domestic violence and child endangering in October or November 2021. No services were referred to Mother while she was incarcerated. During CCDCFS's involvement, "[t]here was a no-contact order through the Courts."

{¶ 13} Buckhalter testified that she had not had any communication with Mother since April 2021. Buckhalter recalled there were times before Mother was incarcerated that Mother would not attend Zoom meetings with her to discuss the case plan. "She would not join the call, and then I'll call her on the phone and she said she's joining, but then she never joined one."

{¶ 14} In June 2021, the Children were placed with their father L.R.T. ("Father") in Arkansas but "they ended up coming back * * * [in] September 2021

due to their behaviors." Father told Buckhalter that "he can't handle their behaviors." While the Children were placed with Father they were still in CCDCFS custody.

{¶ 15} Buckhalter explained that the behaviors Father referred to were the Children "sexually acting out, not listening, and kind of doing what they wanted to do in the home." These behaviors did not continue when they were placed back into the foster home.

{¶ 16} In addition to the Children's father, Buckhalter looked into the Children's maternal grandmother as a possible guardian. Buckhalter concluded that she would not be able to care for the Children because she did not have adequate housing.

{¶ 17} Other than the time the Children spent with their father, the Children were placed in a foster home. Burkhalter observed them with their caregivers there. Buckhalter recalled that the Children "interacted well with the caregivers. They get along with the family. There's other children in the home. They are obedient. They listen to and take directions * * *." According to Buckhalter, the Children are "doing good in the home" and are bonded with their caregivers. The Children also receive counseling services.

**B. Stacy Jackson**

{¶ 18} Jackson is a social worker for CCDCFS who was assigned to work on the Children's case in November 2021. According to Jackson, Mother's case plan included "[d]omestic violence, education classes and parenting classes."

{¶ 19} Jackson testified that Mother made no progress on her case plan services. Jackson never had contact with Mother. Jackson did speak with the social worker at the jail, who would have visits with Mother and report back to Jackson. Due to COVID-19 protocols, Mother was unable to engage in parenting or domestic violence services while she was incarcerated.

{¶ 20} Jackson reviewed a certified journal entry admitted into evidence that reflected Mother's plea of guilty to "Child Endangering and Domestic Violence," both committed against L.R.-R. Jackson testified that as part of her sentence, Mother was placed at a women's facility in Akron and, therefore, could not take care of the Children. Mother was incarcerated the entire time Jackson was assigned the case. Mother had a no-contact order with L.R.-R. that was still in place the day of the hearing, according to Jackson.

{¶ 21} With regard to the Children's current situation, Jackson claimed they were doing "[w]onderful. They're very bonded with their foster parents and the siblings that they have acquired by being in that home."

## C. The Children's Guardian ad Litem

{¶ 22} The Children's guardian ad litem (the "GAL") opined that it was "in the children's best interest that they be committed to the permanent custody of the Agency." She made the following recommendation in open court:

> As we've heard today mom has not completed her case plan services[;] she's had little contact with her children.

> The [C]hildren have spent a period of time with their father; however, the father wasn't able to maintain them in the home.

Neither parent is able to care for the [C]hildren at this time.

They have been in temporary custody for over two years and are doing very well currently with their current caregivers where they will remain if permanent custody is granted.

{¶ 23} In her report, the GAL stated that the Children had been placed in their current foster home "after CCDCFS was granted pre-dispositional temporary custody * * *." The GAL reported that from June 2021 to September 2021 the Children were in Father's care in Arkansas but returned to their original foster home after Father reported the Children were "out of control." According to the GAL, the foster father reported that once the Children were placed back into the foster home, they "transitioned back into [the] home and schools right away" and "have reported few ongoing problems with [the Children]."

{¶ 24} In the foster home, the Children have "improved socially and emotionally, they learned English as Spanish had been their primary language, they became involved in several activities, and they bonded with their foster parents and became part of their foster family." "[T]he [C]hildren had behavioral issues when they first came to [the foster] home in 2020, but after adjusting to a routine and structure, they improved." According to the GAL, Children are "thriving and doing well." The Children's foster parents wish to adopt them.

{¶ 25} The Children play soccer and basketball and are enrolled in school. Neither of the Children has been diagnosed with any special needs. At school, L.R.-R. receives reading services and is being evaluated for an IEP. Both of the Children receive "English Language Learner services." Additionally, the Children see a school

counselor and the foster parents are "in the process of starting outside counseling services for the [C]hildren."

{¶ 26} Regarding Mother, the GAL reported:

Since the time the [C]hildren were placed in the temporary custody of CCDCFS, Mother has not participated in Case Plan services. There has been a no contact order between Mother and L.R.-R. in Mother's criminal case. Mother had one or two in-person visits and one or two video visits with he [C]hildren in 2020. Mother has been incarcerated for the last several months on her criminal domestic violence case related to the abuse of L.R.-R. It has been reported that she has been found guilty and sentenced, and the no contact order remains.

{¶ 27} According to the GAL, the Children "are not of sufficient age or maturity to express their wishes" regarding custody.

{¶ 28} The report concluded with the GAL's recommendation that "it is in the best interests of the [C]hildren that they be committed to the permanent custody of CCDCFS." In support of her recommendation, the GAL reiterated that "Mother is currently incarcerated, there is a no contact order in effect between Mother and L.R.-R., and Mother has not completed Case Plan services."

## III. Law and Analysis

{¶ 29} In her sole assignment of error, Mother argues that "the trial court's award of permanent custody and termination of [her] parental rights is against the manifest weight of the evidence."

{¶ 30} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24. Further, a juvenile court's award of permanent

custody is not "against the manifest weight of the evidence when the record contains competent, credible evidence by which the court could have found that the essential statutory elements for any award of permanent custody have been established." *In re A.N.*, 8th Dist. Cuyahoga No. 110608, 2021-Ohio-4214, ¶ 29. "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." (Citations omitted.) *In re V.S.*, 8th Dist. Cuyahoga No. 109966, 2021-Ohio-1818, ¶ 27.

{¶ 31} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.*, 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 16. To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply, or that (B)(2) applies. *Id.* "Second, courts must determine that terminating parental rights and granting permanent custody to the agency is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

## A. R.C. 2151.414(B)(1) Factors

{¶ 32} In its March 16, 2022 journal entries, the juvenile court made a finding under R.C. 2151.414(B)(1)(d) that the Children had "been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period."

{¶ 33} "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the

date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414.

{¶ 34} The record indicates that the Children were continuously in CCDCFS custody from January 27, 2020, until the time of the hearing on March 16, 2022. L.R.-R. was adjudicated abused and neglected and Xi.R.-R. was adjudicated neglected on September 17, 2020. Applying R.C. 2151.414, the Children had been in temporary agency custody for over 23 months at the time of the hearing. Accordingly, the juvenile court properly found that the Children were in CCDCFS's temporary custody for 12 or more months of a consecutive 22-month period, satisfying R.C. 2151.414(B)(1)(d).

{¶ 35} Having found that the Children had been in CCDCFS's custody for "twelve or more months of a consecutive twenty-two month period" under R.C. 2151.414(B)(1)(d), the juvenile court was not required to make further findings to determine whether the Children cannot or should not be placed with Mother within a reasonable time under subsection (E) of the statute. Nevertheless, the court did make an additional finding that the Children "cannot be placed with one of the child's parents within a reasonable period of time or should not be placed with either parent," and made findings consistent with several (E) subsections.

{¶ 36} Under subsection (E)(1), the court found for both of the Children that

[f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed

continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

{¶ 37} Under subsection (E)(5), regarding both Children, the court found that Mother "is incarcerated for an offense committed against the child or a sibling of the child."

{¶ 38} Under subsections (E)(6), regarding both Children, the court found that Mother

has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05, 2907.07, 2907.08, 2907.09, 2907.12, 2907.23, 2907.25, 2907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01; 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11 of the Ohio Revised Code, and the child or a sibling of the child was a victim of the offense, or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Ohio Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.

{¶ 39} Under subsection (E)(15), the court found for L.R.-R. that Mother

has committed abuse as described in section 2151.031 of the Ohio Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Ohio Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

{¶ 40} Under subsection (E)(16) allowing the court to consider "any other factor the Court finds relevant," as relates to Xi.R.-R., the court found that "Mother committed abuse against the child's sibling and the Court determines that the serious nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety."

**{¶ 41}** Upon review, we find that all of the court's subsection (E) findings are supported by clear and convincing evidence in the record. According to the record, Mother pled guilty to domestic violence and child endangering committed against L.R.-R. and was serving a sentence as a result. A no-contact order had been entered against Mother prohibiting her from having contact with L.R.-R. Further, the court heard testimony from Buckhalter and Jackson that Mother had not engaged in nor completed her case plan services. Though Mother stated that she was going to engage with services, she never did.

**{¶ 42}** Accordingly, the juvenile court's subsection (E) findings are supported by undisputed evidence in the record.

### B. R.C. 2151.414(D)(1) and (2) Best-Interest Factors

**{¶ 43}** In determining whether granting CCDCFS's motion for permanent custody was in the Children's best interest, the juvenile court looked at both R.C. 2151.414(D)(1) and (D)(2). While the juvenile court was not required to look at both, the court's findings under each are supported by undisputed evidence in the record.

#### 1. R.C. 2151.414(D)(1)

**{¶ 44}** In assessing whether the grant of permanent custody was in the Children's best interest, the court considered the factors under subsections (a), (b), (c), and (d) of R.C. 2151.414(D)(1).

**{¶ 45}** Under subsection (a), the court considered "the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster

parents[.]" The court found the Children are "bonded with caregivers and foster siblings."

{¶ 46} Under subsection (b), the court considered "the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child[.]" Under this subsection the court found that the "GAL recommends permanent custody."

{¶ 47} Under subsection (c), the court considered "the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period[.]" The court found that the Children have "been in agency custody for over two years."

{¶ 48} Under subsection (d), the court considered "the child's need for a legally secure permanent placement[.]" The court found that each of the Children "deserves a safe and stable environment where [they] can thrive. This cannot be achieved with Mother as she is currently incarcerated, previously committed abuse against [L.R.-R.], and has not completed case plan services."

{¶ 49} Each of the juvenile court's findings is supported by undisputed evidence in the record. Testimony from Buckhalter, Jackson, and the GAL report demonstrated that the Children are bonded with their foster family who wished to adopt them; the Children are too young to express their wishes; the GAL recommended permanent custody be granted to CCDCFS; the Children had been in

agency custody since January 2020; and that Mother was, at the time of the hearing, serving her sentence for domestic violence and child endangering.

{¶ 50} In light of the foregoing, the manifest weight of the evidence supports the juvenile court's finding "by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent."

### 2. R.C. 2151.414(D)(2)

{¶ 51} Turning to R.C. 2151.414(D)(2), if all four of its subsections apply, "permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency." The juvenile court analyzed the evidence in relation to each of the four subsections and found that permanent custody was in the Children's best interest.

{¶ 52} Subsection (a) directed the juvenile court to determine whether "one or more of the factors in division (E) of [R.C. 2151.414] exist and that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." As addressed, the juvenile court found that evidence had been presented supporting five of the division (E) factors, and our review affirmed the juvenile court's analysis that the undisputed evidence supported the conclusion that the Children cannot or should not be placed with one of their parents within a reasonable time.

{¶ 53} Subsection (b) directed the juvenile court to determine if the Children had been in agency custody for two years or longer and, therefore, no longer qualified for temporary custody pursuant to R.C. 2151.415(D). R.C. 2151.415(D)(4) states:

> the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

{¶ 54} CCDCFS filed its complaint of neglect and abuse on January 28, 2020, and was granted predispositional temporary custody on the same day. Therefore, at the time of the March 16, 2022 hearing, it was undisputed the Children had been in agency custody for over two years.

{¶ 55} Subsection (c) directed the court to determine if the child met the requirements for a planned permanent living arrangement pursuant to R.C. 2151.353(A)(5). If the child did not meet the requirements, then this element was satisfied. Here, CCDCFS did not request for the Children to be placed in a planned permanent living arrangement and there is no evidence that any of the statutory requirements were met.

{¶ 56} Finally, subsection (d) directed the court to determine whether, "prior to the dispositional hearing, no relative or other interested person has filed or been identified in a motion for legal custody of the child." The record indicates no such motion was filed.

{¶ 57} Because the evidence presented at the hearing supported all four subsections of (D)(2), the juvenile court was required to find that awarding CCDCFS permanent custody was in the Children's best interest.

{¶ 58} In reviewing permanent custody proceedings, we are mindful that "the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). This court has additionally held that the "discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 59} We find the court acted within its discretion, consistent with the clear and convincing evidence in the record, when it terminated Mother's parental rights and granted permanent custody of the Children to CCDCFS. Because the trial court's decision was not against the manifest weight of the evidence, Mother's sole assignment of error is overruled.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LISA B. FORBES, JUDGE

ANITA LASTER MAYS, P.J., CONCURS;
CORNELIUS J. O'SULLIVAN, JR., J., CONCURS (WITH SEPARATE CONCURRING OPINION ATTACHED)

CORNELIUS J. O'SULLIVAN, JR., J., CONCURRING:

{¶ 61} I concur with the majority opinion but write separately to address an egregious error at trial that undermines confidence in the legal system and threatens the finality of the Children's placement.

{¶ 62} In the moments before the March 16, 2022 trial began, counsel for father asked the court for a continuance because father recently volunteered for service in the United States Army. Father's counsel advised the court that his client was in basic training in South Carolina (Fort Jackson). Basic training includes the soldier being on task from 4:30 a.m. to 9:00 p.m.

{¶ 63} The state incorrectly opposed the motion for continuance, stating that father's Army duty was "voluntary" and that "we," the state, "are ready to go." Without further thought or discussion the trial court improperly denied the father's motion for continuance and proceeded to trial in his absence. Although father has not filed a notice of appeal in this case, given the trial court's unlawful action, its

judgment is subject to collateral attack at any time during the pendency of his service in the United States Army.

{¶ 64} The Servicemembers Civil Relief Act ("SCRA"), codified in 50 U.S.C. 501 et seq., serves two purposes:

> "to provide for, strengthen, and expedite the national defense through protection extended by this Act to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation;" and, "to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service."

*In re Adoption of W.C.*, 189 Ohio App.3d 386, 2010-Ohio-3688, 938 N.E.2d 1052, ¶ 11-12 (12th Dist.), quoting 50 U.S.C. 502 (1) and (2); *see also Brandt v. Weyant (In re Brandt)*, 437 B.R. 294, 296 (Bankr.M.D.Tenn.2010).

{¶ 65} Thus,

> Under the SCRA, a person in military service is entitled to a continuance in "any civil action or proceeding, including any child custody proceeding," 50 U.S.C. app. § 522(a) (2006 & Supp. IV 2011), upon a showing that military service prevents the person from appearing in court. "While the act does not arbitrarily stay all trials, it should be **liberally construed** so as to protect the civil rights of those serving in our armed forces during the tenure of their service." *State v. Wilson*, 234 Minn. 570, 572, 48 N.W.2d 513 (1951). (Emphasis added.) *Fazio v. Fazio*, 91 Mass.App.Ct. 82, 84-85, 71 N.E.3d 157 (2017).
>
> "The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns."

*Brandt* at 297, quoting 50 U.S.C. 526(a).

{¶ 66} The purpose of the proceeding below was, in part, to provide a final, safe, and stable environment in which the Children can be raised. The trial court's denial of father's continuance, and the state's argument against granting him a continuance, run afoul of the SCRA and subject the court's final order to collateral attack at any time during the duration of father's military service in United States Army.

{¶ 67} Therefore, I concur with the majority, but write separately to acknowledge the egregious error in the trial proceeding.