[Cite as *In re O.C.*, 2022-Ohio-190.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | |
|---|---|
| IN RE O.C. | : |
| A Minor Child | : |
| [Appeal by L.C., Mother] | : |
| | : |

No. 110568

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** January 27, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD18909707

---

### *Appearances:*

Edward F. Borkowski, Jr., *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michelle A. Myers and Joseph C. Young, Assistant Prosecuting Attorneys, *for appellee* Cuyahoga County Division of Children and Family Services.

Rachel A. Kopec, *for appellee* Guardian ad Litem.

MARY EILEEN KILBANE, J.:

{¶ 1} Appellant L.C. ("Mother") appeals from the juvenile court's decision granting the appellee Guardian ad Litem's ("GAL") motion for permanent custody

of her minor child, O.C., to the appellee Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). The agency has filed a brief in support of Mother asking this court to reverse. After a thorough review of the record, we reverse.

**Factual and Procedural History**

{¶ 2} O.C. was born to Mother on August 2, 2018. Four days later, on August 6, 2018, CCDCFS filed a complaint for dependency, alleging that Mother lacked stable housing, could not provide for O.C.'s basic needs, had inconsistently engaged in mental-health treatment, and had four other children that were previously adjudicated neglected and dependent and placed in the permanent custody of the agency.[1] The complaint sought temporary custody of O.C. The agency simultaneously filed a motion for emergency predispositional custody of O.C. The juvenile court granted the agency's motion for predispositional temporary custody, and O.C. was placed in a foster home.

{¶ 3} On January 2, 2019, the court adjudicated O.C. dependent. The court also approved the agency's case plan, which listed objectives for Mother related to basic needs, housing, mental health, and parenting. The permanency plan was reunification.

{¶ 4} On April 25, 2019, the agency filed a motion to modify temporary custody to permanent custody. The motion referred to Mother's "chronic

---

[1] Paternity was not confirmed when the complaint was filed. J.W. was subsequently confirmed as O.C.'s father. J.W. was minimally involved in the proceedings and is not a party to this appeal.

intellectual disability" and alleged that Mother had "failed to demonstrate the ability to independently provide appropriate care for the child long-term."

{¶ 5} On August 15, 2019, Mother filed a motion for in-home unsupervised visitation. The motion cited agency social worker Cynthia Hurry's ("Hurry") recent semiannual review ("SAR"), in which Hurry stated that Mother had been doing well at supervised visits in her home and that O.C. "is comfortable in her care." Hurry also stated that she had consulted with the GAL, who attended a visit and agreed "that mother would be able to have unsupervised visits in her home with O.C. and it would not present a safety issue." Following an attorney conference on August 26, 2019, the court denied Mother's motion for in-home unsupervised visitation.

{¶ 6} On September 27, 2019, the agency filed a motion to amend its April 25, 2019 motion for permanent custody to a motion for a first extension of temporary custody. On October 3, 2019, the court appointed a new GAL ("GAL 2") for O.C., after the initial GAL asked to be removed from the case due to a conflict of interest because she had been the GAL for Mother's other children who were placed in the permanent custody of the agency. Following a hearing on December 3, 2019, the court granted the agency's motion for a first extension of temporary custody.

{¶ 7} On January 8, 2020, the agency filed a motion for a second extension of temporary custody and request for specific findings of fact. On January 21, 2020, the court held a hearing on this motion. Hurry testified at the hearing that Mother had been very consistent over the course of the case. Specifically, Hurry testified that Mother had been going to mental health counseling weekly, had completed a

supportive visitation program, had completed a nurturing parenting program, and had progressed to another parenting program known as Help Me Grow. Hurry testified that O.C. did not have any specialized needs pursuant to the case plan, but he was involved in the Help Me Grow program with Mother. Hurry also addressed Mother's alleged intellectual disability, stating that she had spoken at length with Mother's counselor, who believed that while Mother "does have some mild cognitive impact," the counselor was "not suspicious that mother would ever meet any criteria to receive services." Following the hearing, the court granted the agency's motion for a second extension of temporary custody on January 24, 2020.

{¶ 8} On July 6, 2020, the agency filed a motion to terminate temporary custody with an order of protective supervision. The motion sought an order vesting legal custody in Mother with protective supervision by CCDCFS. In its brief in support of the motion, the agency stated:

> [I]t is in the best interest of the child to be returned home to the mother, because she has substantially complied with the case plan and has reduced the risk that initially caused the child to be removed. Specifically, the mother has completed parenting, mental health services, and has obtained appropriate housing. Mother is also involved in the child's intervention services.

{¶ 9} On July 15, 2020, the court held a telephonic hearing on the agency's July 6, 2020 motion. At the outset of the hearing, the court inquired as to the status of Mother's neuropsychological evaluation. The agency informed the court that Mother had completed an evaluation at the Cleveland Clinic in June and it was waiting on the report from that evaluation. Specifically, Hurry testified:

There's been allegations of her having a low mental capacity, so part of it was developmental and determining if there were any kind of delays that would impact her parenting.

We have not seen any evidence of that in this case since I've been appointed to this case, but given the history of the case we wanted to make sure we had crossed every T, dotted the I's and this was the last thing she was asked to complete.

Hurry also stated that none of the support professionals engaged with Mother through her case plan, including her therapist, believed that the evaluation was necessary. The court held the motion in abeyance and sua sponte continued the matter until the outstanding report was received.

{¶ 10} On September 2, 2020, the court held a dispositional review hearing. At the outset of this hearing, the CCDCFS attorney informed the court that because it had learned that morning that GAL 2 would be changing her recommendation, the agency would be requesting a continuance in order to conduct an interactional evaluation between Mother and O.C. GAL 2 then addressed the court, stating that her concerns about Mother's intellectual functioning were not alleviated upon her review of Mother's neuropsychological evaluation. GAL 2 went on to state that she would join the agency's request for an interactional evaluation and would ultimately file a motion for permanent custody.

{¶ 11} After an extended discussion of changes to the juvenile court's filing system that resulted in a proposed amendment to the case plan being filed incorrectly, the court stated that it was suspending the overnight visitation that had begun in May 2020. Mother's attorney asked the court if witnesses could be heard on the issue of visitation, and the court allowed this. Hurry testified that the agency

wanted to continue overnight visitation. She expressed concern that as a result of cancelling visitation, O.C. would miss contacts with three of his own service providers. Hurry explained that O.C. had recently been diagnosed with a speech delay and a speech therapist had begun working with O.C. and Mother during her in-home visits. Hurry also testified that an early childhood mental health provider and a Help Me Grow worker were working with O.C. and Mother during their visits. Hurry expressed concern that if overnight visitation were suspended and the visits were limited to one day, it would be challenging to coordinate all of the service providers. Furthermore, Hurry testified that suspending overnight visitation would be detrimental to both O.C. and Mother because there would be minimal time for them to interact with each other. Hurry also testified that Mother had "always been very good in visits" and "has always been very attentive to [O.C.]."

{¶ 12} On September 3, 2020, the court issued a journal entry granting the parties' request for a continuance so that an interactional evaluation could take place and adopting GAL 2's recommendation for two days of unsupervised visitation. The journal entry also stated:

> The Court finds that the Agency did not comply with statutory requirements for implementing a change in the case plan and started overnight visitation two weeks before filing an amended case plan. Additionally, the Agency did not properly file the amended case plan that was submitted on May 22, 2020.

> Based on this finding, the court denied the amended case plan filed on August 20, 2020 and suspended overnight visitation. The court referred Mother to the Cuyahoga County Juvenile Court Diagnostic Clinic for an interactional [evaluation].

{¶ 13} On September 4, 2020, the court issued a journal entry finding that the parties were no longer requesting an interactional evaluation. The court amended its September 3, 2020 order to exclude the interactional evaluation.

{¶ 14} On October 7, 2020, GAL 2 for O.C. filed a motion to modify temporary custody to permanent custody.

{¶ 15} On December 18, 2020, the court arraigned Mother on GAL 2's motion for permanent custody in a telephonic hearing. Visitation was again addressed at this hearing. The agency requested that Mother have an extended visit with O.C. from December 21, 2020, to January 7, 2021, or at a minimum, the agency requested that weekly visitation be increased from two nights to three nights. The agency made this request in part because it believed it was "appropriate based on the progress of [O.C.] and mother's relationship and their bonding and the therapy that's involved," but also in part due to the inherent risk in transporting O.C. back and forth between his foster placement in Lorain County and Mother's home in Cuyahoga County at a peak of the COVID-19 pandemic. GAL 2 objected to both requests. The court denied the agency's request.

{¶ 16} On January 7, 2021, GAL 2 for O.C. requested to be removed from the case:

> It has been brought to my attention that the mother of my ward [O.C.] has a sister and that I was involved in the sister's permanent custody case representing foster parents who were adverse to the sister.
>
> While neither of these cases intertwine, it is because they are sisters I am concerned having discussed this with several other attorneys and

with [Mother's counsel] that there is an appearance of bias because I have been involved with the family in different roles.

So I am asking the court to remove me as Guardian ad Litem to avoid any potential appellate issues regarding the appearance of bias in this case.

The court granted GAL 2's request to withdraw and appointed a new GAL ("GAL 3") for O.C.

{¶ 17} On February 10, 2021, the agency filed a motion to dismiss GAL 2's motion to modify temporary custody to permanent custody filed on October 7, 2020. The motion argued that because GAL 2 was no longer a party to the case, she was no longer capable of prosecuting the motion. The motion went on to state that:

O.C. and his mother have been ready for re-unification since at least July 2020, and the former GAL's actions of filing a strained motion requesting Permanent Custody of O.C. to CCDCFS have unduly delayed this family's right to be free from unnecessary state involvement, and kept a child in foster care rather than being reunified with his family.

On March 26, 2021, Mother filed a motion to terminate temporary custody and for legal custody to be granted to her. On April 2, 2021, GAL 3 filed a motion to modify temporary custody to permanent custody.

**Trial**

{¶ 18} Trial on GAL 3's motion to modify temporary custody to permanent custody began on May 5, 2021. The parties' opening statements reflected the unique nature of this case. GAL 3 stated that "this is a very different case than what we're used to" and explained that this was the first time he had ever filed a motion for permanent custody. The agency attorney stated that the agency "does not consent

to an order of permanent custody because [O.C. and Mother] have been resilient in joining together with an unbreakable bond."

## I. Neuropsychologist Dr. Rachel Galioto

{¶ 19} GAL 3 called five witnesses. Dr. Rachel Galioto ("Dr. Galioto"), a neuropsychologist at the Cleveland Clinic, testified as to the neuropsychological evaluation of Mother she completed in June 2020. Dr. Galioto testified that she understood that Mother was referred to her to "basically confirm a history of intellectual disability." Dr. Galioto described how the evaluation was conducted, stating that she spoke with Mother for approximately 30 minutes to gather some relevant personal history and discuss any concerns Mother may have over her cognitive functioning. Next, Mother spent several hours with a technician, completing a variety of tests designed to evaluate her intellectual abilities. Dr. Galioto testified that among other things, Mother was given the Wechsler Adult Intelligence Test, which is designed to assess intellectual abilities including "verbal, visual, reasoning, skills processing, and speed working memory." According to Dr. Galioto, the tests overall showed "a mild intellectual disability." Dr. Galioto also testified that Mother's Full Scale IQ ("FSIQ") was 64, and traditionally a score under 75 would be indicative of an intellectual disability. Dr. Galioto testified that this score was the average of eight to 10 different index scores on multiple tests making up the Wechsler test. Dr. Galioto explained that because there was a significant scatter among Mother's composite index scores, the FSIQ was not an accurate

reflection of her ability. Specifically, Mother scored extremely low for verbal skills and significantly higher for nonverbal skills.

{¶ 20} Dr. Galioto went on to testify that an intellectual disability involves both intellectual functioning and adaptive functioning. Because Dr. Galioto was with Mother for a short period of time and was only determining her intellectual functioning, she could not say for sure that Mother had an intellectual disability. Referencing her report, Dr. Galioto also reiterated her conclusion that she has no position whether any intellectual disability in any way prevents Mother from successfully parenting. Finally, Dr. Galioto testified that while Mother's intellectual ability was stable and would not improve or deteriorate over time, her functioning could improve over time.

## II. GAL 2

{¶ 21} Next, GAL 3 called GAL 2 as a witness. GAL 2 testified that she was assigned to this case for a little over one year, during which time she was able to regularly observe Mother. GAL 2 described the bond between O.C. and Mother "as more of a friend bond," and testified that she observed a stronger bond between O.C. and his foster parents. GAL 2 also testified that she had concerns about Mother's residence, stating:

> I think it's appropriate for a couple. My concern with raising a child there is there's very limited space for him to play. There's no outside area to play. It is an apartment, but there's a parking lot around it.

GAL 2 testified that O.C. had his own bedroom with appropriate furniture and toys. Beyond the lack of outdoor play space, GAL 2 did not elaborate on her concerns

about Mother's home, and she went on to testify that Mother's home was safe and had everything that O.C. needed.

{¶ 22} GAL 2 went on to testify that she had ongoing concerns about Mother's intellectual disability, and upon reviewing Dr. Galioto's report and journal entries from the removal proceedings for Mother's older children, GAL 2 believed that Mother's developmental delays were one of the reasons that Mother would not be able to parent children long term. According to GAL 2, this is why she filed her motion for permanent custody. Specifically, GAL 2 testified:

> When I reviewed the neuropsych that was completed during this case, it raised concerns about mother's IQ level and her ability, from my perspective, to be able to parent in particular a special needs child long term without substantial supports.

> Now, I understand that any parent would potentially have supports for a special needs child. In this case mother has additional delays that raise concerns related to her ability to consistently engage in those services and follow through with what those services are intended to accomplish for [O.C.].

When asked to clarify O.C.'s special needs, GAL 2 testified that O.C. has significant speech delays and "when he cannot make himself understood he has temper tantrums." GAL 2 believed that O.C. would likely need speech therapy for an extended period of time, as well as additional early intervention services.

{¶ 23} GAL 2 also confirmed that this case was the first time she had ever filed a motion for permanent custody. During GAL 2's testimony, she was questioned at length regarding her review of numerous journal entries from the removal proceedings for Mother's older children. GAL 2 confirmed that the court in those proceedings never made a finding that Mother had developmental delays

that prevented her from parenting. GAL 2 also testified that the earlier proceedings involved a significant amount of domestic violence related to the fathers of Mother's older children, none of whom are O.C.'s father or otherwise involved in this case. GAL 2 likewise confirmed that in this case, there have been no allegations of domestic violence related to Mother or her current partner, J.G. The parties stipulated as to various journal entries from the removal proceedings for Mother's older children, and they were entered into evidence.

### III. Agency Social Worker Cynthia Hurry

{¶ 24} GAL 3 also called Hurry as a witness. Hurry testified that she was employed by CCDCFS as a social worker and had been with the agency for 26 years. Hurry had been assigned to the instant case since its inception in August 2018. Hurry testified that at the outset of the case, there were no viable placement options with any family members. Hurry also explained that the agency briefly considered J.G., Mother's partner with whom she lived, as a placement option, but that option was not pursued because "the strengths of mother presented a likelihood that we could forward for reunification so at that point that's what we decided to focus on."

{¶ 25} Hurry also testified that she had a "working knowledge" of Mother's older children and their proceedings. Hurry explained that because Mother had a history with the agency, the agency was notified when she gave birth to O.C., and that history prompted the agency to initiate the underlying dependency proceeding. The case plan goals for Mother related to mental health and stable housing. Hurry explained the distinctions between O.C.'s proceedings and that of his siblings,

stating that the issue of domestic violence, which had been the most significant issue in the other children's cases according to the agency, was resolved prior to O.C.'s birth. Hurry testified that there have been no domestic violence concerns for Mother or her partner J.G., and she described J.G. as having a "calming" influence on Mother, noting that Mother's life has grown increasing stable over the course of their relationship, which began approximately six months before O.C. was born, and this case. Hurry also testified that J.G. has been very supportive of Mother's efforts in this case and that the agency has no concerns about his appropriateness with O.C. or children in general.

{¶ 26} Hurry went on to state that the majority of Mother's other issues were resolved early on in O.C.'s case. Mother had secure housing when O.C. was born, but she was not initially on the lease of her apartment with J.G. In the fall of 2019, Mother got on the lease and the two moved to a larger apartment. Hurry testified that Mother and J.G. shared a one-bedroom, two-bathroom apartment, and that it was well-maintained, organized, and safe and appropriate for O.C. When asked if there had been any concerns as to O.C.'s health and well-being after visits with Mother, Hurry described an incident that occurred at Mother's first overnight visit with O.C. in which the foster parents complained that O.C. returned with diaper rash and a second incident in which the foster parents complained that there was a spot of feces in his diaper. After the first incident, the foster parents communicated to Hurry that O.C. had eczema and had been prescribed a particular lotion to treat it that Mother did not have, likely because she had no way of knowing that O.C. had

eczema prior to her initial visitation with him.  Hurry stated that these things were not safety concerns and were more appropriately categorized as complaints.  Hurry testified that Mother's case plan goal for stable housing was completed in October 2019.

{¶ 27} Hurry testified that in the past, prior to the proceedings in this case, Mother had engaged somewhat inconsistently with mental health services, but was consistently engaged in mental health services throughout the instant case.  Hurry also explained that Mother was already engaged with mental health services when she first met Mother.  Mother was referred to a provider through the hospital where she had given birth to O.C., but because the provider had a months-long waitlist, Mother contacted a previous agency she had worked with and scheduled a meeting with a counselor at that agency.  Therefore, Hurry did not make a mental health referral for Mother, but she included Mother's mental health services in the case plan.  Mother had a diagnosis of depression and post-traumatic stress disorder.  Hurry testified that Mother had met with her counselor regularly since 2018, on a weekly or biweekly basis.  For the duration of this case, according to Hurry, Mother has consistently engaged with her counselor, meeting with the counselor on a weekly or biweekly basis as needed.  Additionally, Mother took medication as prescribed until her mental health stabilized.

{¶ 28} Hurry described that Mother had a high level of engagement with all of the other support professionals involved in the case.  Hurry also described Mother's engagement with a variety of parenting services.  The agency referred

Mother for supportive visitation, as is its standard for dependency cases, and Mother completed that 16-week program. Following that program, the agency recommended a nurturing parenting program, which Mother also successfully completed. Hurry described both programs as successful based on her conversations with the providers involved throughout Mother's involvement in the programs. Following the completion of the nurturing parenting program, the parent educator from that program recommended the home visitor program, which started in early 2020. According to Hurry, the purpose of this program was to help facilitate the planned transition of reunification.

{¶ 29} Hurry testified that she visited O.C.'s foster parents on a monthly basis prior to COVID-19. She also testified that because of transportation challenges during the course of the case, she was often responsible for driving O.C. to and from his foster home, and at times, she saw the foster parents and Mother up to four times per week. Hurry testified that she observed O.C. interact with both foster parents, the foster parents' biological daughter who was around O.C.'s age, and the foster parents' nanny. She described those interactions as positive.

{¶ 30} Hurry testified that she had consistent contact with Mother throughout this case. Hurry would either speak with or visit Mother at least once during O.C.'s visits with Mother. When asked to describe the bond between Mother and O.C., Hurry testified that their bond was "very good" and that O.C. was happy at Mother's home and "starts getting excited before we stop the car." Hurry testified

that Mother receives income from social security and has consistently been able to use this income to provide for O.C.

{¶ 31} When questioned as to O.C.'s eating habits and whether Hurry saw any issues with O.C.'s diet when he was with Mother, the following exchange took place:

ATTORNEY: Do you see any issues with the way [O.C.] is eating?

HURRY: I don't.

ATTORNEY: And have you witnessed him eating lunch or —

HURRY: I mean, there's been times that we've gone places with food being the goal. Birthday visits where she's brought things. I've seen him eat a variety of things in a variety of settings.

ATTORNEY: Have you ever been a part of any conversations with [Mother] as far as what type of meal [O.C.] should be given?

HURRY: No, I haven't seen a real reason to have a concern about what she's feeding him. [O.C.] is a perfectly fine weight for his age. There haven't been any issues. The issue when I'm talking about his struggles with eating are more what we see with children that are going through some displacement that don't have a lot of control over their setting. This is sort of what we see typically, and so he's always in a state of adjusting. He's adjusting when he first gets to mom, and then he gets adjusted, and then he goes [back] to foster care and he's adjusting again. So we've talked about this with [early childhood mental health therapist] Miss Scott that that is rather normal, and I'm aware that they have worked with her on that issue. I have not had that particular conversation with her because I don't see anything that she's done as a concern. I have never seen her offer him anything that I thought was a concern.

Hurry went on to give examples of foods she had seen Mother provide for O.C., including sandwiches, fruit, scrambled eggs, SpaghettiOs, and chicken nuggets.

{¶ 32} Hurry testified that in January 2019, the agency conducted a SAR and made a finding to continue with reunification. Hurry explained that if the agency staff working on the case cannot reach a consensus at a SAR meeting, an appeal may be filed. In this case, the facilitator — an agency supervisor — initiated an appeal and as a result of that appeal, the agency determined that it would file a motion for permanent custody. Consequently, the changes that agency staff had planned at that SAR for increased visitation were not implemented, and the agency filed a motion for permanent custody in April 2019. Hurry testified that she was only present for a portion of the SAR meeting and did not know why the facilitator initiated an appeal.

{¶ 33} With respect to Mother's intellectual capacity, Hurry testified that while Mother's limitations may present an additional challenge, she did not think that it would present an unreasonable challenge for Mother. Hurry explained that because the agency was aware of Mother's intellectual limitations from her prior history with the agency, she was aware that an intellectual disability had been identified as a concern related to O.C. as well. Hurry described observing Mother at length during their initial visits, and based on "how she engaged in the visit" and being "really more than adequate at meeting [O.C.'s] needs, at observing what's going on at the moment," Hurry thought that Mother's functioning was higher than it had been described previously. Specifically, Hurry testified that she regularly saw Mother receive and understand handouts from other service providers, and she has never seen Mother struggle to read or understand something that has been given or

told to her. Hurry also explained that based on her observations and conversations with the other service providers involved in the case, Mother is able to communicate effectively. Furthermore, Hurry testified that Mother has been proactive at identifying potential issues or questions she has and dealing with them appropriately, such as recognizing O.C.'s need for a speech therapist, identifying when he had a fever and suggesting how to treat him, and discerning when O.C. had an earache. Hurry testified that while Mother's limitations would likely impact O.C., she did not think that the impact would be detrimental to O.C.

{¶ 34} Hurry also testified that the foster parents had recently informed her that they had contacted O.C.'s pediatrician because they believed that he may be on the autism spectrum. When asked what her opinion would be if O.C. were diagnosed with autism, Hurry testified:

> I mean, it caused me to really look into the future quite a bit. In terms of her capacity, I think [Mother] is pretty resourceful, pretty savvy in utilizing systems.

> She has been involved with systems throughout her life. She certainly shows no hesitation to that at this point for [O.C.], and I can only imagine that if he had a need like that arise, that she would address it.

Beyond this hypothetical diagnosis, Hurry testified that O.C. has a speech delay, but has no other special needs.

{¶ 35} Hurry testified that if Mother and O.C. were reunified, they would continue to receive every service they were receiving at the time of the trial. She also explained that Mother had begun to make initial plans for O.C.'s future in

anticipation of their reunification, including researching nearby daycares and pediatricians.

{¶ 36} Hurry testified that overall, Mother has been very committed to O.C. and to every aspect of her case plan services. Hurry testified that Mother never missed a visit with O.C. and was generally very consistent in keeping her appointments with numerous other providers in the case. Hurry testified that at various points throughout the case, there had been abrupt and sometimes drastic changes, and Mother has adapted to those changes well and maintained her motivation to be reunited with her son. Finally, when asked by the court why reunifying with Mother was in O.C.'s best interest, as opposed to placing him in the permanent custody of the agency, Hurry testified that the agency did not "have cause to keep him and we haven't had cause to keep him for some time."

**IV. Foster Parents**

{¶ 37} GAL 3 also called both foster parents to testify. Foster father testified that they had an immediate bond with O.C., and that eventually, O.C.'s first word was "daddy." They testified that O.C. has a speech delay and they work with him and his speech therapist. The foster mother testified that they were concerned that O.C. might have autism because of his speech delay and his emotional outbursts. The foster parents testified that they have two biological children, a two-and-a-half-year-old daughter and a four-month-old son, and that O.C. and their daughter get along very well and always play together. The foster father described a typical day for O.C., as well as the typical foods he ate, including oatmeal, pasta, tomato soup,

chicken nuggets, and fruit. The foster parents testified that they considered O.C. a part of their family and they would be interested in adopting him if the agency was awarded permanent custody.

{¶ 38} GAL 3 offered exhibits into evidence, the court admitted the exhibits into evidence, and GAL 3 rested.

**V. Speech Language Pathologist Anne Sweeney**

{¶ 39} The agency called Anne Sweeney ("Sweeney"), O.C.'s speech language pathologist, to testify. Sweeney has worked as a speech language pathologist with the Cuyahoga County Board of Developmental Disabilities for nine years and works with children up to three years old. Sweeney testified that she began working with O.C. in July 2020 following a referral from the agency and an assessment of his needs. Sweeney testified that she worked with O.C. with both Mother and the foster parents. She explained that her program was heavy in parent coaching in order to give parents strategies to implement with their children on a regular basis. Sweeney testified that her work with O.C. and Mother was guided by O.C.'s individualized family service plan, and outcomes the plan focused on included O.C.'s use of words, ability to understand words, and ability to remain calm when he was frustrated. Sweeney testified that she developed the plan with Mother and a service coordinator based on what Mother expressed that she wanted to work on during their first meeting. Sweeney testified that Mother had mentioned that O.C. would become upset and have temper tantrums at times, and she denied that any of O.C.'s behaviors as described by Mother gave Sweeney serious concern about O.C.

Sweeney also testified that the plan was reevaluated every six months, and at one point, the plan was updated to remove the outcome relating to O.C.'s ability to understand words because he had progressed in that area. Sweeney testified that while she does not diagnose autism in the children she works with, she was familiar with some of the signs of autism in children O.C.'s age. According to Sweeney, beyond his limited use of words, she had not observed any of those signs in O.C. She also testified that while it is difficult to predict, she believed that O.C. had a good prognosis for being verbal and for using language.

{¶ 40} Sweeney said that since July 2020, she would have sessions with O.C. and Mother either virtually or in person, during which she would observe Mother and O.C. playing and interacting and give Mother strategies to enhance their interactions and work towards O.C.'s goals. Sweeney explained that her sessions were often held during playtime because that was naturally conducive to the work they were doing with O.C. According to Sweeney, Mother was generally very good about keeping their appointments. Sweeney perceived Mother to be invested in O.C.'s progress and to care deeply about the work they were doing. Sweeney also described Mother's interactions with O.C. positively, testifying that Mother was playful and responsive and that Mother and O.C. interacted well. Overall, Sweeney described Mother and O.C.'s relationship as warm, bonded, and happy. Sweeney also testified that she observed Mother implement the strategies Sweeney taught her and carrying them over into other aspects of O.C.'s routine, such as offering O.C. choices during mealtime. Sweeney testified that Mother understood the strategies

Sweeney taught her. Finally, Sweeney testified that she became aware that Mother had intellectual limitations after conversations with lawyers involved in this case, but in the ten months that she had worked with Mother, she never had any concerns about these limitations impacting Mother's ability to meet O.C.'s needs. Sweeney likewise denied having any concerns about O.C.'s safety in the care of Mother.

## VI. Behavioral Health Therapist Karen Sabo

{¶ 41} Next, the agency called Karen Sabo ("Sabo"), who testified that she was a behavioral health therapist with The Centers for Families and Children. Sabo testified that she has worked with Mother since September 2018, and they would see each other on a weekly or biweekly basis. Sabo testified that Mother's attendance at and engagement during their sessions has been very good. Sabo explained that she diagnosed Mother with mild major depressive disorder. According to Sabo, her sessions with Mother are focused on helping Mother respond to stressors, regulate her emotions, improve her relationships, and work on negative self-thoughts. Sabo also testified that she was aware of the removal proceedings with Mother's older children, and they worked on helping Mother process the trauma associated with those proceedings.

{¶ 42} Sabo testified that Mother has demonstrated remarkable growth, maturity, and resilience. Sabo explained that despite the numerous stressors Mother had experienced over the course of the case, including COVID-19, the death of her father, miscommunications with O.C.'s foster parents, and abrupt changes to visitation, she has dealt with her emotions in a healthy way and continued to make

progress. While Sabo was aware of Mother's intellectual limitations, she testified that she had not observed anything that made her concerned about Mother's ability to function on a daily basis. With respect to any potential impact on Mother's ability to parent, Sabo testified that she had seen Mother and O.C. interact during their sessions and had not seen anything that caused Sabo to have concerns about O.C.'s care. Finally, Sabo testified that she referred Mother to the Cleveland Clinic for a neuropsychological evaluation at the request of the agency and not because she had made an independent determination that this evaluation was necessary.

**VII. Parent Educator Gabriella Asseff**

{¶ 43} The agency also called Gabriella Asseff ("Asseff"), a parent educator with the home visitor program through Ohio Guidestone's Bright Beginnings Parents and Teachers Program. Asseff testified that she has been a parent educator for 16 years. In this role, Asseff visited Mother's home twice a month to provide education about child development, help with activities Mother could do with O.C., and conduct assessments to make sure that O.C. was developing appropriately. Asseff explained that she has been working with Mother and O.C. since February 2020, when they were referred from Mother's nurturing parenting program. Asseff described the family's curriculum, explaining that she worked with Mother a lot on picky eating, which she testified was a normal issue for children O.C.'s age. Asseff testified that Mother has been successful in encouraging O.C. to try new foods. She also described doing a safety checklist of Mother's home and testified that Mother followed through on her suggestions to make her home safer for O.C. Asseff testified

that Mother was "exemplary" at keeping their appointments, and that during their sessions, Mother exhibited good problem-solving skills and was constantly aware of O.C.'s needs. Asseff described Mother and O.C. as being able to communicate well with one another, citing O.C.'s responsiveness to Mother's calmness and voice and Mother's warm and caring attitude toward O.C. Asseff discussed a guideline used to assess a parent's interactions with their child, known as PICCOLO, and stated that pursuant to that guideline, Mother scored very highly. Asseff testified that she had no concerns about Mother's ability to care for O.C., and specifically, she had not observed anything related to Mother's intellectual functioning that would cause her to be concerned about Mother's ability to care for O.C.

## VIII. Early Childhood Mental Health Therapist Donna Scott

{¶ 44} Finally, the agency called Donna Scott ("Scott"), an early childhood mental health therapist and consultant with the agency. Scott testified that she was referred to Mother and O.C. by Hurry in May 2020. At that time, Scott understood the goal of the case plan to be reunification, so she was tasked with engaging with the family and determining if there was anything that would help them in that transition. Scott worked with Mother to strengthen O.C.'s sleeping and eating routines and to support their relationship. Overall, Scott testified that Mother was consistent in working with her and was responsive to Scott's feedback. Scott explained that beyond O.C.'s speech delay, she did not observe significant development concerns in him. Further, Scott testified that much of the challenges she observed were related to sleeping and eating, which was not unusual for children

O.C.'s age, and in particular when the child is nonverbal. Scott also testified as to the particular difficulty of O.C.'s situation, given that he was in a challenging developmental stage and that he was frequently transitioning between two different households, noting that Mother tried to develop a routine and keep her routine similar to that of the foster family to aid O.C.'s transition.

{¶ 45} Scott testified that O.C. had developed healthy attachments to Mother and the foster parents. She also explained that this case was unusual in that typically when a child has been away from his biological family for as long as O.C. has been away from Mother, she would not recommend reunification. In this case, however, Scott testified that Mother has been doing what was asked of her, had benefited from her case plan services, had developed a very strong relationship with O.C., and had spent a significant amount of time with O.C. throughout this case. Scott testified that she has worked with hundreds of families and considered Mother's commitment to O.C. to be exceptionally high. Scott also testified that she had reviewed Mother's neuropsychological evaluation. Scott described being somewhat surprised by the evaluation based on her own impressions of Mother and her experience working with adults with developmental disabilities. Scott believed that Mother's adaptive functioning was high and therefore did not believe that the report was a complete assessment of whether Mother had an intellectual disability. Finally, Scott testified because of his strong relationships with all of his caregivers, any outcome in this case would be challenging for O.C. Ultimately, Scott believed that

reunification was in O.C.'s best interest because he deserved to be with his biological family and they had such a strong and important relationship.

{¶ 46} Following this testimony from the agency's witnesses, GAL 3 addressed the court and provided his recommendation. He commended Mother's progress but ultimately recommended permanent custody. GAL 3 was cross-examined by the agency attorney and Mother's attorney. He testified that he had observed Mother and O.C. together on five occasions and he had seen O.C. and the foster parents together on two occasions. GAL 3 testified that Mother's intellectual limitations were a major factor, but not the only factor, in his recommendation. When asked why he believed that Mother's intellectual limitations impacted her ability to meet O.C.'s basic needs, GAL 3 responded "I just – I don't see it." He also testified that he was concerned about O.C.'s nutrition as a result of what Mother fed him, based on the three meals that he had seen Mother feed him. Specifically, he recalled seeing O.C. have chicken nuggets for two meals in a row and described that as "a major concern." GAL 3 was also concerned that Mother allowed O.C. to choose what to eat on various occasions, and he chose to eat SpaghettiOs. He did not express the same concern that the foster family described allowing O.C. to choose what to eat for breakfast or feeding him tomato soup with pasta.

{¶ 47} On May 25, 2021, the court denied Mother's motion for legal custody and granted the GAL's motion to modify temporary custody to permanent custody. With respect to the best interest factors under R.C. 2151.414(D)(1), the court made the following findings, in relevant part:

The child has a very strong, significant bond with his foster parents/caregivers as well as his foster sibling, who is close in age to the child. Child has been in this placement since August 2018 and this is the only home the child has ever resided in. One of the child's first words was "daddy" (referring to foster father). Child does not have a relationship with his biological Father. Child has a bond/relationship with Mother, but not as strong or significant as the bond is with foster family. [GAL 2 and GAL 3] both described the relationship between Mother and Child to be that of a friendship as opposed to parent/child relationship.

The child is too young to express his wishes. However, three guardians ad litem assigned to this case have recommended permanent custody as being in the child's best interest.

Child has been in Agency custody since his release from the hospital — 2 years and 9 months ago. Child was 4 days old when he came into Agency custody.

The court also made findings pursuant to R.C. 2151.414(E)(2), (4), (11), and (16).

{¶ 48} Mother appeals, presenting two assignments of error for our review:

I. The trial court abused its discretion by granting permanent custody to CCDCFS against the manifest weight of the evidence.

II. The trial court abused its discretion by denying appellant's motion for legal custody.

**Law and Analysis**

**The GAL's Motion for Permanent Custody**

{¶ 49} In Mother's first assignment of error, she argues that the trial court abused its discretion by granting permanent custody of her child to the agency against the manifest weight of the evidence. We agree.

{¶ 50} As an initial matter, we must emphasize the extraordinary procedural aspects of this case. In virtually every other parental rights case in this appellate district where a motion for permanent custody is filed, it is filed by the agency. In

this case, the motion for permanent custody in this case was filed not by CCDCFS, but by the child's GAL, when the agency's own motion to terminate temporary custody had been pending for nearly a year. Further, while it is relatively rare that the GAL and CCDCFS are at odds, in the instant appeal, CCDCFS filed an appellee brief urging this court to reverse the judgment of the lower court.

{¶ 51} The United States Supreme Court has recognized that a parent's liberty interest in the care, custody, and control of their children "is perhaps the oldest of the fundamental interests recognized by this court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In light of this essential and basic civil right, Ohio courts consistently recognize that "permanent termination of parental has been described as 'the family law equivalent of the death penalty in a criminal case.'" *In re A.N.*, 8th Dist. Cuyahoga No. 110608, 2021-Ohio-4214, ¶ 26, quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Therefore, the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution require that termination of parental rights proceedings are fundamentally fair and that parents are "afforded every procedural and substantive protection the law allows." *Id.*, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997).

{¶ 52} While a parent's interest is paramount, it is not absolute and is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012,

¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 53} A trial court must make two determinations before granting permanent custody. R.C. 2151.414 provides that a trial court may grant permanent custody of a child to an agency if, after a hearing, the court determines by clear and convincing evidence that one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies and that an award of permanent custody is in the child's best interest. Therefore, "an appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re Ka.R.*, 8th Dist. Cuyahoga No. 110504, 2021-Ohio-4125, ¶ 29, quoting *In re AR.S.*, 2021-Ohio-1958, 174 N.E.3d 28 (8th Dist.), citing *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28. The Ohio Supreme Court defines clear and convincing evidence as "'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re A.N.*, 8th Dist. Cuyahoga No. 110608, 2021-Ohio-4214, at ¶ 29, quoting *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Likewise, we will not reverse a juvenile court's award of permanent custody as being against the manifest weight of the evidence when the record contains competent, credible evidence by which the court

could have found that the essential statutory elements for any award of permanent custody have been established. *Id.*, citing *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 22.

{¶ 54} In this case, it is undisputed that O.C. had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period, thus satisfying the condition under R.C. 2151.414(B)(1)(d). Therefore, the issue at the heart of this appeal is whether the trial court's finding that permanent custody was in the best interest of the child was supported by clear and convincing evidence.

{¶ 55} When considering the best interest of a child, R.C. 2151.414(D)(1) directs the court to consider all relevant factors, including, but not limited to: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7) through (11) apply. While a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent custody determination, "there is not one element that is given more weight than the others pursuant to the statute." *In re Schaefer*, 11 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶ 56} Here, the trial court considered the best-interest factors under R.C. 2151.414(D)(1)(a), (b), (c), (d), and (e). While the court pointed to specific evidence

in the record in support of its findings for some of the best-interest factors, the court's findings were based on testimony from the foster parents and GAL 2 and GAL 3 in the case and appeared to largely ignore the overwhelming evidence from the six professionals, with combined decades of experience, that did not support the trial court's findings. It is worth reiterating that GAL 2 was removed from the case due to a conflict of interest, and GAL 3 was assigned to the case for several months and only interacted with Mother and O.C. on five occasions. The agency professionals and other support professionals who testified at trial have combined decades of experience and have interacted with Mother and O.C. on a regular, even weekly, basis for the duration of this case.

{¶ 57} With respect to R.C. 2151.414(D)(1)(a), O.C.'s interaction and interrelationship with his parents, siblings, relatives, and foster caregivers, the juvenile court found that O.C. had "a very strong, significant bond" with his foster parents and sibling, noting that O.C.'s first word was "daddy." The court acknowledged that O.C. and Mother also had a bond and relationship, but described it as a "friendship as opposed to parent/child relationship" and "not as strong or significant as the bond is with [his] foster family." These findings mirror the testimony of the foster parents and the guardians ad litem and seem to disregard the extensive testimony from Hurry, Sabo, Asseff, Sweeney, and Scott that described the significant bond between O.C. and Mother. The trial court also ignored the evidence that J.G., Mother's partner, had positive and appropriate interactions with O.C.

While the GALs described Mother and O.C.'s relationship as a friendship, it is unclear what exactly was meant by this description, let alone why it is problematic.

{¶ 58} The trial court also found that O.C. had been at his foster placement since August 2018 and "this is the only home the child has ever resided in." While the trial court is correct that O.C. was placed with the same foster family for the duration of this case, the record also reflects that as the case progressed, O.C. spent significant time with Mother, including unsupervised visitation at her home three days a week. As Scott testified at trial, "at one point [O.C.] was at [Mother's] house as much as he was at his foster home"; this is not a case where Mother had minimal interaction with her child. For these reasons, this factor does not weigh in favor of permanent custody.

{¶ 59} With respect to R.C. 2151.414(D)(1)(b), the wishes of the child, the court found that O.C. was too young to express his wishes, but all three guardians ad litem assigned to this case recommended permanent custody. As discussed above, and as will be discussed more fully below, these recommendations generally went against the opinions of numerous professionals involved in the case and ultimately went against the agency's request that temporary custody be terminated.

{¶ 60} According to testimony from GAL 2 and GAL 3, as well as all of the GALs' recommendations and reports submitted throughout the case, these recommendations were based largely on Mother's intellectual limitations. GAL 3's report filed before trial stated that Mother's neuropsychological evaluation "would seem to demonstrate that there is an intellectual disability on the part of [Mother]

that would not make it in the best interest of the child to be reunified." The report also stated that GAL 3 believed that Mother's intellectual disability "would prevent her from providing adequate care for O.C." Neither of these statements are adequately explained, and both are undermined by the record. Dr. Galioto, who conducted Mother's neuropsychological evaluation and prepared the corresponding report, testified that while the tests administered showed that Mother had an intellectual disability, this was an incomplete assessment because she did not assess Mother's adaptive functioning. Perhaps more significantly, nothing in the report or Dr. Galioto's testimony indicated that Mother's limitations, whether or not she actually has an intellectual disability, would in any way prevent her from providing adequate care for O.C. Moreover, beyond concerns about O.C.'s nutrition that appeared to be largely unfounded, no GAL was able to point to anything indicating that Mother has failed to provide adequate care for O.C. at any point throughout the case. On the contrary, GAL 2 supported multiple extensions of temporary custody because she recognized that Mother had made significant progress and she had no safety concerns for O.C. spending time with Mother.

{¶ 61} Additionally, the GALs expressed concern that Mother would not be able to accommodate O.C.'s "special needs" on a long-term basis. When asked to define O.C.'s alleged special needs, GAL 2 testified that he has a significant speech delay and has been engaged in speech and occupational therapy. Contrary to this testimony from GAL 2, O.C. has never been engaged in occupational therapy. Finally, GAL 3 cited a potential autism diagnosis as additional evidence that Mother

would not be able to meet O.C.'s long-term needs. While there was minimal testimony presented at trial that the foster parents discussed the potential of an autism diagnosis with O.C.'s pediatrician, no actual medically based evidence was presented at trial that O.C. had been or would be diagnosed with autism. No evidence was presented that O.C. had demonstrated any early signs of autism, beyond his speech delay, and none of the professionals who worked with O.C. on a regular basis had ever observed any signs of autism in the child. Therefore, this factor does not weigh in favor of permanent custody.

{¶ 62} With respect to R.C. 2151.414(D)(1)(c), the custodial history of the child, the court found that O.C. has been in agency custody since he was released from the hospital at birth in August 2018. While the agency concedes O.C.'s custodial history, it does not concede that this factor weighs in favor of permanent custody as alleged by the GAL. Instead, the agency has emphasized that it attempted reunification in July 2020 when it filed a motion to terminate temporary custody, but this request was delayed by the trial court and remained pending on the court's docket for ten months. During this ten-month period, the agency repeatedly attempted to increase Mother's visitation, in accordance with its goal of reunification. At multiple points, the trial court denied these requests to increase visitation, not because of any safety concern expressed by anyone involved in the case, but because of perceived errors in filing the proposed visitation in the juvenile court. Additionally, we reiterate that although O.C. was in the agency's custody for nearly three years, he spent a significant amount of time with Mother during that

period. Therefore, this factor does not necessarily weigh in favor of permanent custody.

{¶ 63} With respect to R.C. 2151.414(D)(1)(d), the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody, the court found that O.C. "deserves a safe, stable, consistent, and nurturing environment where his basic needs, daily needs, and any medical needs can be met and he can thrive." This finding cannot be disputed. It does not, however, resolve the question of whether Mother could provide such an environment for O.C. According to the overwhelming evidence presented at trial, Mother had been providing a safe and nurturing environment for O.C. and would continue to do so upon reunification.

{¶ 64} Finally, with respect to R.C. 2151.414(D)(1)(e), whether any factors in R.C. 2151.414(E)(7) to (11) apply, the court found that (E)(11) applies to Mother. R.C. 2151.414(E)(11) states:

> The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 65} The agency and Mother do not dispute that Mother's older children were placed in the permanent custody of the agency. They do dispute, however, that Mother has failed to clearly and convincingly establish that she can provide a legally

secure placement and adequate care for O.C. We reiterate that Mother established that she was capable of providing a legally secure permanent placement and adequate care for O.C. throughout the duration of this case. She had extensive visitation with O.C., and the record reflects that she has had a stable home and has been able to provide for O.C.'s basic needs for the duration of this case.

{¶ 66} Further, the record reflects that the issues leading to the removal of her older children were either resolved or inapplicable with respect to O.C. In those removal proceedings, the identified issues were related to domestic violence, Mother's lack of stable housing and inability to provide for the children's basic needs, and her failure to consistently engage in counseling sessions. The record is clear that domestic violence has never been an issue in the instant case. The record also reflects that Mother has maintained stable and appropriate housing and has been able to meet O.C.'s needs for nearly three years. Further, the record reflects that Mother has consistently engaged in mental health counseling and has benefited from that service. In fact, the record reflects that Mother has consistently, proactively, and enthusiastically engaged with all of her case plan services and has benefited from these services.

{¶ 67} Finally, GAL 2 and GAL 3 both referred to these findings in the journal entries from prior removal proceedings as evidence that Mother's intellectual disability continues to prevent her from providing adequate care for O.C. and cited her neuropsychological evaluation as evidence that Mother failed to benefit from her case plan services in this regard. The only evidence in the record

supporting these findings are unsupported assertions by the GALs. Not only were these assertions unsupported, they were directly contradicted by other testimony in the record. Professionals who had regularly interacted with O.C. and Mother over the course of nearly three years and who had extensive experience in early childhood development, adults with developmental disabilities, and mental health, all testified that Mother was able to adequately care for O.C. regardless of her intellectual limitations.

{¶ 68} The trial court's findings largely mirrored testimony and arguments from GAL 2 and GAL 3 at trial, even when these arguments were incorrect or overwhelmingly unsupported by the other evidence introduced at trial and the entirety of the record in the case. The statutory factors do not weigh in favor of permanent custody. Therefore, we find that the trial court's finding that permanent custody would be in O.C.'s best interest was not supported by clear and convincing evidence.

{¶ 69} Additionally, we note that, while it was not required to do so in order to grant the GAL's motion for permanent custody, the trial court found that O.C. cannot be placed with Mother or should not be placed with Mother within a reasonable time, pursuant to findings under R.C. 2151.414(E). The trial court found that Mother's chronic intellectual disability is so severe that it renders her unable to provide an adequate permanent home for O.C., pursuant to R.C. 2151.414(E)(2), and that she has had parental rights terminated with respect to O.C.'s older siblings and failed to provide evidence that she can provide for O.C. pursuant to R.C.

2151.414(E)(11). As described above, these findings are explicitly contradicted by the evidence and the record in this case.

{¶ 70} The trial court also found that the parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child pursuant to R.C. 2151.414(E)(4). Because the trial court did not clarify whether it was referring to Mother or Father when it made this finding, we can only assume that it intended the finding to refer to both parents. This finding is not based on any evidence, let alone clear and convincing evidence. In fact, even the GALs who moved for permanent custody repeatedly commended Mother for her commitment to O.C. and her case plan services throughout the case.

{¶ 71} Finally, with respect to any other factor the court found relevant under R.C. 2151.414(E)(16), the court found that Mother's neuropsychological evaluation indicated that Mother "was cooperative but appeared to give up somewhat easily at times during difficult tasks and the Behavioral Observations for Thought Processes indicate they were somewhat scattered." The evaluation and report did include this statement. Viewing this statement in the context of not only the entire evaluation and report, but the relevant evidence in this case, including testimony from Dr. Galioto, reveals that this statement is dispositive of neither Mother's intellectual abilities nor her ability to adequately parent O.C.

{¶ 72} While we appreciate the concern of the GALs and the trial court regarding Mother's ability to care for O.C., we find these concerns to be unfounded. The evidence in this case did not support a finding that permanent custody was in

O.C.'s best interest, and it unequivocally did not support a finding that O.C. cannot be placed with Mother or should not be placed with her within a reasonable time. Therefore, following a thorough review of the record and law, we conclude that the trial court's judgment was against the manifest weight of the evidence. Mother's first assignment of error is sustained.

**Mother's Motion for Legal Custody**

{¶ 73} In her second assignment of error, Mother argues that the trial court abused its discretion by denying her motion for legal custody. R.C. 2151.353 provides that if a child is adjudicated abused, neglected, or dependent, the court may:

> Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings.

R.C. 2151.353(A)(3). Legal custody is:

> a legal status that vests the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

R.C. 2151.011(B)(22). Because legal custody is not as drastic a remedy as permanent custody, the trial court's standard of review in a legal-custody proceedings is not clear and convincing evidence, but "merely preponderance of the evidence." *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7, citing *In re D.P.*, 10th Dist. Franklin No. 05AP-117, 2005-Ohio-5097, ¶ 52. The court must determine the

appropriateness of legal custody in accordance with the best interest of the child as supported by a preponderance of the evidence presented at the dispositional hearing. *In re R.B.*, 2019-Ohio-1656, 136 N.E.3d 42, ¶ 48 (8th Dist.), citing *In re T.R.*, 8th Dist. Cuyahoga No. 102701, 2015-Ohio-4177, ¶ 44. A "preponderance of the evidence" is "evidence that's more probable, more persuasive, or of greater probative value." *In re D.P.* at ¶ 52, quoting *State v. Finkes*, 10th Dist. Franklin No. 01AP-310, 2002 Ohio App. LEXIS 1422 (Mar. 28, 2002).

{¶ 74} As discussed at length in our analysis of Mother's first assignment of error, the trial court's findings and its denial of Mother's motion for legal custody, was not supported by a preponderance of the evidence. Therefore, the trial court's denial of Mother's motion for legal custody, which motion was supported by competent and credible evidence and bolstered by the agency's own motion to terminate temporary custody, was error. Mother's second assignment of error is sustained.

{¶ 75} The trial court's judgment granting permanent custody to CCDCFS and denying Mother's motion for legal custody is reversed and the case is remanded for further proceedings consistent with this opinion.

{¶ 76} Judgment reversed and remanded.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY EILEEN KILBANE, JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS;
SEAN C. GALLAGHER, A.J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

SEAN C. GALLAGHER, A.J., DISSENTING:

{¶ 77} I respectfully dissent and would affirm the decision of the juvenile court.

{¶ 78} Although Mother should be commended for her demonstrated commitment to case-plan services and her efforts to regain custody of her child, the focus must remain on the best interest of the child, not the parent. Ultimately, the natural rights of a parent are always subject to the ultimate welfare of the child, which is the controlling principle to be observed. *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 20, citing *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 79} Because the best interest of the child is paramount in any custody case, "we are to liberally interpret the statutes to provide for the care and protection of the child * * *." *In re A.B.*, 110 Ohio St.3d 230, 2006-Ohio-4359, 852 N.E.2d 1187, ¶ 32. "R.C. 2151.414(D)(1) requires a juvenile court to *consider all* relevant factors, including but not limited to the five factors set out in R.C. 2151.414(D)(1)(a) through

(e), in determining the best interest of a child in a permanent-custody case." (Emphasis added.) *In re A.M.*, Slip Opinion No. 2020-Ohio-5102, ¶ 42. "The statute requires a weighing of all the relevant factors" and "does not even require the court to weigh [one] factor more heavily than other factors." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64. As such, "[t]he weight given to the R.C. 2151.414(D)(1) factors is within the juvenile court's discretion." *In re R.S.*, 8th Dist. Cuyahoga No. 110210, 2021-Ohio-2271, ¶ 37, citing *In re P.B.*, 8th Dist. Cuyahoga Nos. 109518 and 109519, 2020-Ohio-4471, ¶ 76.

{¶ 80} In this case, the juvenile court heard the testimony of the professionals, the guardians ad litem, the social worker, and the foster parents. The juvenile court was well aware of the professionals' opinions and Mother's progress through her engagement with the professionals in this case. The juvenile court also was aware that the position of CCDCFS is at odds with the recommendations of the guardians ad litem. It is evident that the recommendations of the guardians ad litem focused on the best interest of the child. The guardians ad litem recognized Mother's commitment to case-plan services, but they had ongoing concerns about Mother's intellectual limitations and her ability to independently provide appropriate care for the child long term. A juvenile court has "discretion to consider the wishes of the children expressed through their guardian ad litem. R.C. 2151.414(D)(2)." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 58. "Ultimately, parental interests are subordinate to the child's interest * * *." *In re B.C.*, 141 Ohio

St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, at ¶ 20, quoting *In re Cunningham*, 59 Ohio St.2d at 106, 391 N.E.2d 1034.

{¶ 81} The juvenile court complied with its statutory duty to consider all the best-interest factors, including those R.C. 2151.414(D)(1) requires, and found by clear and convincing evidence that it is in the child's best interest to be placed in the permanent custody of the CCDCFS. The juvenile court was not required to provide an analysis of all the evidence. *See In re A.M.* at ¶ 42. Nonetheless, the juvenile court did set forth some analysis of the best-interest factors in support of its decision.

{¶ 82} The juvenile court considered that O.C. "has a very strong, significant bond with his foster parents/caregivers as well as his foster sibling" and that the child "has been in this placement since 2018 and this is the only home the child has ever resided in." Although O.C. was bonded with Mother, the bond was not as strong and the relationship with Mother as described by two of the GALs in the case as "that of a friendship as opposed to a parent/child relationship." The juvenile court considered that all three guardians ad litem assigned to the case "have recommended permanent custody as being in the child's best interest." The juvenile court considered that O.C. was "4 days old when he came into Agency custody" and that O.C. had been in the custody since "2 years and 9 months ago." It was evident to the juvenile court that the "[c]hild deserves a safe, stable, consistent, and nurturing environment where his basic needs, daily needs, and any medical needs can be met and he can thrive."

{¶ 83} I find that the trial court's determination that permanent custody would be in O.C.'s best interest is supported by clear and convincing evidence. There was evidence showing Mother's developmental delays and her level of intellectual functioning, which would likely impact O.C. O.C. has some special needs and receives therapy, and the guardians ad litem expressed concerns with Mother's ability to meet the needs of O.C. long term. Mother already had four other children removed from her custody. At the time of trial, O.C. had been in the care of the foster family for over two and a half years. O.C. was placed in the foster home shortly after birth and has developed a significant bond with the foster family, even referring to his foster father as "Daddy." It was undisputed that Mother loves her child and she demonstrated her commitment to case plan services; however, permanent custody pertains to what is in the child's best interest. *See In re A.N.*, 8th Dist. Cuyahoga No. 110608, 2021-Ohio-4214, ¶ 42. Guardian Ad Litem Richard D. Summers stressed this point in his recommendation.

{¶ 84} The record reflects that the trial court satisfied its statutory duty under R.C. 2151.414(D) and properly exercised its discretion in weighing the best-interest factors. Because the juvenile court's determination is supported by clear and convincing evidence and is not against the manifest weight of the evidence, I believe the decision to terminate Mother's parental rights and to commit the child to the agency should be affirmed.